FREMONT INDEMNITY COMPANY, Plaintiff-Appellee, v. SPECIAL EARTH EQUIPMENT CORPORATION *et al.*, Defendants-Appellees (Fruin-Colnon Corporation *et al.*, Defendants-Appellants).

Fifth District   No. 5—83—0831

Opinion filed February 14, 1985.

KARNS, J., dissenting.

Allan Goodloe, Jr., of Pope & Driemeyer, of Belleville, and Michael E. Wilson, of Greensfelder, Hemker, Wiese, Gale & Chappelow, P.C., of St. Louis, Missouri, for appellants.

C. Patout Ducey, of Ducey, Feder & Ducey, Ltd., of Belleville, for appellee Fremont Indemnity Company.

JUSTICE WELCH delivered the opinion of the court:

This case concerns pile-driving operations at the Jefferson Barracks Bridge Project and the construction of an insurance contract. Fremont Indemnity Company (Fremont) is the insurer. Special Earth Equipment Corporation (SEECO) is the insured. The pile-driving operations were performed by Fruin-Colnon Corporation and Granite Construction Company, which parties were engaged in a joint venture at all times pertinent to this appeal and will hereinafter be referred to collectively as "the Joint Venture." SEECO supplied the Joint Venture with various components for the pile-driving operations. Banner Iron Works, Inc. (Banner), supplied certain equipment to SEECO. Banner commenced an action against SEECO in the circuit court of Monroe

County for the price allegedly due Banner on its contract with SEECO. The Joint Venture, also named a defendant in that action, cross-claimed against SEECO for damages based on incidents involving the pile driving apparatus. Banner and the Joint Venture each were awarded a judgment by default against SEECO. Fremont's counsel's subsequent motion to reconsider, filed on behalf of SEECO, was denied. Thereafter, Fremont commenced the instant action in the circuit court of Monroe County, naming SEECO, Banner, and the Joint Venture as defendants, seeking a declaratory judgment that the above-mentioned contract of insurance provided no coverage for the judgments obtained by the Joint Venture and Banner against SEECO. The trial court granted Fremont's motion for summary judgment as to both Banner and the Joint Venture. The Joint Venture appeals. Banner and SEECO are not involved in this appeal. There is no cross-appeal.

The pertinent facts are as follows: According to affidavits and copies of "purchase orders" of record, SEECO supplied the Joint Venture with a diesel pile hammer and guide rails, 150 feet of box leads, and the connectors and pins which hold the leads together. Box leads act as guides for the piling and the pile hammer during the pile-driving operation. The box leads and hammer are raised to and maintained in position by a crane. The purchase order price of the hammer with guide rails was $56,475. The purchase order price of the box leads was $22,877. The purchase order includes, *inter alia,* various hydraulic system components and "[a]ll necessary valving and hoses for plumbing into American 9Z99 crane."

On July 14, 1978, a set of box leads broke while the leads were being lowered from operating position. Herb Minatre, a SEECO engineer, visited the site the next day. According to Minatre, whose recorded statement is transcribed of record, Minatre suggested that a different raising and lowering procedure be employed. However, on July 21, 1978, while another set of leads was being raised, the leads broke again. Minatre's statement indicates his belief that SEECO's design of the leads may have been at fault. According to Minatre's statement, when he visited the site after the first lead failure, it was "very obvious that some sort of failure had occurred." According to Minatre, the hammer guides, though not defective, were also damaged. Asked whether the bridge itself had been damaged, Minatre replied that "very very minor" damage had been done to a trestle. He stated that the second failure was identical to the first.

In count I of its cross-claim against SEECO, the Joint Venture sought $57,610.14 as damages for repair of the defective leads, alleging that said leads were not fit for the particular purpose for which they

were purchased in that they twice "snapped and broke." In count II, the Joint Venture sought $35,000 for labor, materials and overhead expenses for two weeks' delay of the project construction schedule. The Joint Venture was awarded judgment by default against SEECO for SEECO's failure to appear. After a damages hearing, judgment was entered in favor of the Joint Venture in the amount of $34,865.14 as to count I and $32,854.96 as to count II, which according to exhibits of record is itemized as follows: Labor, payroll taxes, workmen's compensation insurance, fringe benefits, overhead and profit totalling $14,960.16; equipment rental, $11,281.26; materials, $1,726.12; repair of damaged pile hammer, $2,484; repair of all lead connectors, $4,413.60; and two weeks' delay at $16,427.48 per week for "fixed and overhead costs," $32,854.96.

Fremont's complaint for declaratory judgment stated, in count I, that the insurance contract afforded no coverage for Banner's and the Joint Venture's judgments against SEECO, and, in count II, that Fremont was relieved of liability under the contract due to SEECO's breach of its duty to forward suit papers to Fremont. The trial court granted Fremont summary judgment against Banner and the Joint Venture based on the first count only. The order signed by the trial judge indicates the following conclusions: That the damage to the leads and the guide rails on the hammer were damages to a single pile-driving apparatus of which all components were sold by SEECO; the other damages incurred by the Joint Venture were a result of expenses incurred in the repair of the defective product itself and delay of the construction operations incident to that repair; no "damage" occurred to property other than that supplied by SEECO; and the damage did not occur in "sudden and accidental" manner. It is from this judgment that the Joint Venture appeals.

The relevant portions of the insurance contract provide in essence that Fremont will pay on behalf of SEECO all sums which SEECO shall become legally obligated to pay as damages because of bodily injury or "property damage to which this insurance applies, caused by an occurrence, if the bodily injury or property damage is included within the completed operations hazard or the products hazard ***." Exclusion (e) states that this insurance does not apply

> "to loss of use of tangible property which has not been physically injured or destroyed resulting from
>> (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
>> (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level

of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured."

Exclusion (f) excludes from coverage

"property damage to the named insured's products arising out of such products or any part of such products."

The contract of insurance defines "damages" as, *inter alia*, damages for loss of use of property resulting from property damage. "Occurrence" is therein defined as an accident which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured. "Property damage" is therein defined as injury to or destruction of tangible property. "Named insured's products" is defined as goods or products manufactured, sold, handled or distributed by the named insured. "Products hazard" is defined as including, *inter alia*, property damage arising out of the named insured's products or reliance upon a representation or warranty made with respect thereto.

■■ ■ Summary judgment should be rendered if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005(c).) The purpose of summary judgment proceedings is to determine whether there is any genuine triable issue of fact which must be passed upon. The right of the moving party to summary judgment must be free from doubt. (*Lawrence v. Rubio* (1980), 85 Ill. App. 3d 472, 476, 406 N.E.2d 946, 951.) We examine the Joint Venture's contentions on appeal with these principles in mind.

As a preliminary matter, the Joint Venture maintains that California substantive law governs this case, the insurance contract having been issued by a California insurer to a California insured. (See *Criterion Insurance Co. v. Reed* (1978), 66 Ill. App. 3d 925, 383 N.E.2d 786.) Fremont has not briefed this issue, and informs this court in oral argument that choice of law should not affect the outcome of this appeal.

We have adopted a four-part framework for consideration of the issues raised in this appeal. The Joint Venture must establish the existence of at least a triable issue of fact as to all four if the judgment in Fremont's favor is to be reversed.

1. Was the damage represented by the Joint Venture's judg-

ment against SEECO caused by an "occurrence"?

2. Are any elements of that judgment "property damage" covered by the general insuring clause of the contract?

3. Are there any elements of "property damage" which are not excluded by Exclusions (e) and (f)?

4. Is Fremont entitled to judgment based on SEECO's failure to forward suit papers?

We answer questions 1, 2, and 3 in the affirmative, and question 4 in the negative, *i.e.*, the Joint Venture does prevail on all four issues.

■ We first consider the Joint Venture's argument that the trial court erred in concluding as a matter of law that there was no "occurrence" with respect to the failure of the leads as that word is used in the insurance contract's general insuring clause. Incorporating the insurance contract's definition of "occurrence" with the definition of "property damage" therein, it can be seen that what is required is an "accident" which results in injury to or destruction of tangible property neither expected nor intended from the standpoint of the insured. These are relatively standard insurance contract definitions. An "occurrence" is found in the area of products liability insurance in the event of deliberate manufacture of a product which is inadvertently mismanufactured, and thereafter results in property damage, as to conclude otherwise would render the coverage virtually meaningless. (*Yakima Cement Products Co. v. Great American Insurance Co.* (1980), 93 Wash. 2d 210, 608 P.2d 254.) Thus, an "accident" has been found where defective doors or concrete panels were installed in buildings, and where the planting of the wrong seed resulted in yield reduction. (See *Yakima Cement Products Co. v. Great American Insurance Co.* (1980), 93 Wash. 2d 210, 608 P.2d 254, and cases cited therein.) Compared to those examples, Mr. Minatre's statement indicates that an "accident" did indeed occur: The hammer guides, though not defective, were also damaged; it was "very obvious" that some sort of failure had occurred; some damage had resulted to a bridge trestle. In our view, whether an "accident" occurred was at least a triable question of fact.

■ Next, the parties dispute whether a triable issue of fact appears as to whether the items of damage claimed by the Joint Venture are "property damage" covered by the general insuring clause. "Property damage" is defined in the contract as injury to or destruction of tangible property. This definition obviously encompasses the leads and hammer guides. However, the Joint Venture asserts that the leads and hammer guides were so integrated with the remainder of the pile-driving rig that the damage was to the Joint Venture's product, not

SEECO's. The sole component of the pile-driving rig referred to by the Joint Venture as not having been supplied by SEECO is the crane. Fremont apparently assumes that the crane was not part of the pile-driving rig, as Fremont fails to directly address the significance of the crane or its use as a component of the pile-driving rig. We would be similarly inclined to conclude that SEECO supplied all components of the pile-driving rig if the record indicated that the crane merely held the rest of the apparatus aloft and could be similarly used for hoisting other equipment and materials. However, the purchase orders for sale of the components supplied by SEECO to the Joint Venture indicate that the crane was connected to the pile-driving rig, not only by a hoist cable, but by hydraulic connections. This supports the Joint Venture's position that the crane was part of an integrated rig, part of which was not supplied by SEECO, and the whole of which was tangible property damaged by the failure of the box leads. (See *Pittway Corp. v. American Motorists Insurance Co.* (1977), 56 Ill. App. 3d 338, 342-43, 370 N.E.2d 1271, 1274; *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1980), 90 Ill. App. 3d 1106, 1111, 414 N.E.2d 41, 45-46.) At the least, no contrary conclusion can be reached as a matter of law on this record.

Fremont argues that loss of use of the crane and other construction equipment, disassembly and reassembly of the pile-driving apparatus, and other delay damages such as fixed overhead constitute intangible or economic loss not covered under the contract. We find it well established under California law that loss of use, fixed overhead expenses, and other intangibles are not recoverable as "injury to or destruction of tangible property" under this type of policy. (See *Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.* (1965), 63 Cal. 2d 602, 407 P.2d 868, 47 Cal. Rptr. 564; *Hogan v. Midland National Insurance Co.* (1970), 3 Cal. 3d 553, 476 P.2d 825, 91 Cal. Rptr. 153; see also *Hartford Accident & Indemnity Co. v. Case Foundation Co.* (1973), 10 Ill. App. 3d 115, 294 N.E.2d 7.) However, in view of our conclusion that the pile-driving rig may be considered injured tangible property in the context of Fremont's motion for summary judgment, loss from damage to such intangibles is recoverable "to the extent that it provides a measure of damages to physical property which is within the policy's coverage" (*Hogan v. Midland National Insurance Co.* (1970), 3 Cal. 3d 553, 562, 476 P.2d 825, 830, 91 Cal. Rptr. 153, 158), *i.e.*, in this case, the pile-driving rig. The damages should be measured by the diminution in value of the pile-driving rig or the cost of restoring it to operating condition, whichever is less. *Geddes & Smith Inc. v. Saint Paul Mercury Indemnity Co.* (1965), 63 Cal. 2d 602, 407 P.2d

868, 47 Cal. Rptr. 564.

Summarizing, we conclude that damage to the pile-driving rig is property damage not excluded from coverage as a matter of law under the general insuring clause of the contract. We next consider the effect of Exclusions (e) and (f):

■■ ■ Exclusion (f) excludes damage to the named insured's products arising out of such products or any part of such products. The Joint Venture argues that this exclusion is ambiguous. Ambiguities should be construed in favor of the insured. (*Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 691, 414 N.E.2d 1218, 1221.) The court in *Sentry Insurance Co. v. S & L Home Heating Co.* found an essentially identical exclusion bereft of ambiguity. We agree. It is brief and direct. It excludes damage to all of the insured's products, whether defective or not. Since the Joint Venture's expenses are to some extent attributable to repairing the damaged leads and hammer guides supplied by SEECO, a portion of such damages is excluded by Exclusion (f). Under the plain language of Exclusion (f), repair of the box leads and the hammer guides is not covered. As to assembly and disassembly of the pile-driving rig, we note that SEECO is not alleged to have assembled, prior to the lead failures, the component parts it supplied. Thus, assembly of the pile-driving rig was not part of the "named insured's products." Under analogous circumstances, involving installation by a third party of doors manufactured by the insured, which doors subsequently proved defective, the California supreme court concluded that while the manufacturer was liable for the cost of the doors themselves, the insurer was liable for the expense of removing the defective doors as well as for installation of replacement doors. (*Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.* (1965), 63 Cal. 2d 602, 608, 407 P.2d 868, 872, 47 Cal. Rptr. 564, 568.) In conformity with *Geddes*, we conclude that Exclusion (f) excludes the cost of repairing the leads and hammer guides, but not the expenses of removing those components from the rig constructed by the Joint Venture or the expenses of reinstalling those components after repair.

■■ As to the effect of Exclusion (e), said exclusion does not apply to all loss of use of tangible property which has not been insured or destroyed; otherwise, the contract should have so stated. While count I of the Joint Venture's cross-claim against SEECO refers to a warranty of fitness for a particular purpose, the allegation that the leads "snapped and broke," and the exhibits supporting that characterization, are sufficient to prevent categorizing loss of use of the crane and other equipment as an Exclusion (e)(2) breach of warranty as a matter of law. The extent of an exclusion essentially identical to the instant

Exclusion (e) has been explained as follows:

"This exclusion distinguishes between a physical breakdown of the insured's product and a mere failure of the product to perform as well as warranted, presumably because the latter is a typical business risk whereas the former is more likely to have catastrophic consequences. One commentator illustrates the distinction as follows:

A boiler sold and installed by the insured in a manufacturing plant fails to heat a quantity of water to the specified temperature, and the plant's capacity is thereby reduced. There would be no coverage for the resulting loss. However, if the boiler suddenly and accidently breaks down, or explodes, without causing physical damage to other property, the loss of use of the plant would be covered. *Defense Research Institute, Annotated Comprehensive General Liability Insurance Policy* 50 (1979)." *(Honeycomb Systems, Inc. v. Admiral Insurance Co.* (D. Maine 1983), 567 F. Supp. 1400, 1407.)

We conclude that none of the elements of "property damage" which the judgment in favor of the Joint Venure against SEECO represents are excluded from coverage by Exclusion (e).

Summarizing the analysis to this point, we conclude that damage to the pile-driving rig, as such, is not excluded from coverage as a matter of law; the Joint Venture's "intangible" or "economic" expenses, while not covered under the contract, are recoverable to the extent that such expenses provide a measure of damage to tangible property, *i.e.*, the pile-driving rig; and the Joint Venture's expenses attributable to the repair of the leads and hammer guides are not recoverable, as opposed to the expenses directly attributable to assembly and disassembly of the pile-driving rig pursuant to those repairs.

■ This conclusion leads us to the fourth and final inquiry, whether Fremont was entitled to summary judgment based on count II of its complaint for declaratory judgment. A summary judgment may be sustained upon any ground warranted by the record, irrespective of whether the particular reasons stated by the trial court are correct. See *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 691, 414 N.E.2d 1218, 1222.

■ ■ The Joint Venture urges that SEECO's failure to forward suit papers does not permit Fremont to avoid liability under the insurance contract since Fremont suffered no prejudice thereby. Fremont argues that prejudice was inherent in the judgment it had no opportunity to defend against. The general rule is that an insurer is not bound by a judgment unless it had notice of the pendency of the action. *(Clem-*

*mer v. Hartford Insurance Co.* (1978), 22 Cal. 3d 865, 587 P.2d 1098, 151 Cal. Rptr. 285; *Samson v. Transamerica Insurance Co.* (1981), 30 Cal. 3d 220, 636 P.2d 32, 178 Cal. Rptr. 343.) However, as a matter of law on motion for summary judgment, Fremont's claim of lack of notice does not entitle it to judgment because Fremont has not shown prejudice resulting therefrom. *Clemmer v. Hartford Insurance Co.* (1978), 22 Cal. 3d 865, 587 P.2d 1098, 151 Cal. Rptr. 285.

Because this record does not reveal the extent of the judgment in favor of the Joint Venture against SEECO which was based on damages covered by the insurance contract, we must reject the Joint Venture's argument that summary judgment in its favor was appropriate. For the same reason, we must reject the Joint Venture's request for prejudgment interest.

For the foregoing reasons, the judgment of the circuit court of Monroe County is reversed, and this cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

HARRISON, J., concurring.

JUSTICE KARNS, dissenting:

I do not believe that the components manufactured or sold by SEECO were so "intertwined" with the crane that damage to a new or different product, a "pile driving rig," occurred under the reasoning of *Pittway Corp. v. American Motorists Insurance Co.* (1977), 56 Ill. App. 3d 338, 370 N.E.2d 127, and *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1980), 90 Ill. App. 3d 1106, 414 N.E.2d 41, and cases therein cited. The attachment of the components manufactured or supplied by SEECO to the crane, which suffered no damage, did not result in "incorporation" or "integration" into a new structure or product which suffered damage. *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1977), 46 Ill. App. 3d 936, 361 N.E.2d 589; *Timberline Equipment Co. v. St. Paul Fire & Marine Insurance Co.* (1978), 281 Or. 639, 576 P.2d 1244.

There has been no property damage within the coverage afforded by the policy, as the only property damage was to the insured's products, which are all excluded from coverage under Exclusion (f). Unless there has been damage to tangible property within the policy coverage, there can be no recovery for economic loss occasioned by "down-time," including those items included in count II of the Joint Venture's complaint. Exclusion (e) excludes from coverage loss of use of tangible

property which has not been physically injured or destroyed from the failure of the insured's products to perform in a satisfactory manner.

I do not consider the pile-driving rig to be tangible property as an entity different from the components supplied by SEECO. Under *Hogan v. Midland National Insurance Co.* (1970), 3 Cal. 3d 553, 476 P.2d 825, 91 Cal. Rptr. 153, which discusses and explains the holdings of the earlier cases of *Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.* (1959), 51 Cal. 2d 558, 334 P.2d 881, and *Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co.* (1965), 63 Cal. 2d 602, 407 P.2d 868, 47 Cal. Rptr. 564, there can be no recovery for intangible or economic loss under California law unless there is damage ·to tangible property other than that which has been manufactured or supplied by the insured.

In *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.* (7th Cir. 1975), 508 F.2d 417, the court reasoned that the inclusion of a defective component, where no physical harm to the other parts results, did not constitute property damage under a general liability policy insuring against product liability property damage. In *Yakima Cement Products Co. v. Great American Insurance Co.* (1980), 93 Wash. 2d 210, 608 P.2d 254, the supreme court of Washington concluded that no intangible damage to tangible property within the policy coverage occurs unless there is proof that the value of the structure or entity into which the insured's product was integrated was in some way diminished. This is in accord with the law of Illinois. *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 414 N.E.2d 1218; *Chambers Gasket & Manufacturing Co. v. General Insurance Co. of America* (1975), 29 Ill. App. 3d 998, 331 N.E.2d 203.

The question of coverage aside, it seems to me that Fremont has demonstrated prejudice as a matter of law and should be relieved of any responsibility under the policy. It never received notice of the actions filed against SEECO, which suffered a default judgment to be entered against it. Fremont had no opportunity to contest the amount of damages assessed against it. In *Pittway Corp. v. American Motorists Insurance Co.* (1977), 56 Ill. App. 3d 338, 370 N.E.2d 1271, the court held that the facts established prejudice as a matter of law where the insured failed to notify the company to enable it to make an effective investigation of the claim asserted against the insured. I consider the conduct of the insured here much more egregious.