CINCINNATI BELL, INC., *v.* HINTERLONG.

. (No. 80CV29138—Decided September 9, 1981.)

Hamilton County Municipal Court.

*Messrs. Rich, Pott, Wetherell, Foster* and *Miller,* and *Mr. Orville J. Miller,* for plaintiff.

*Messrs. Dooley, Heath* and *Schneider Co., L.P.A.,* and *Mr. Edward P. Brueggeman,* for defendant.

HAIR, J.   This matter came before the court on a motion for summary judgment filed by plaintiff, Cincinnati Bell, Inc., pursuant to Civil Rule 56. Civil Rule 56 allows the court to grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

The court must review all evidence in a light most favorable to the non-moving party and if the court determines that reasonable minds could only reach a conclusion adverse to the non-moving party, then the motion will be granted. The court is of the opinion that the plaintiff, Cincinnati Bell, Inc., is entitled to judgment as a matter of law in the sum of four hundred and fifty-seven dollars and 79/100 ($457.79) because there is no genuine issue of fact regarding this defendant's responsibility for the damages incurred by the plaintiff, and further the court specifically finds that the various costs, inclusive of administrative and overhead expenses set out in explicit and voluminous detail within an affidavit filed by plaintiff, are properly chargeable as elements of damages, and that the plaintiff has established to the degree of certainty necessary the direct and associated administrative and overhead expenses involved in the instant case.

The procedural posture of this case is substantially as follows:

8/26/80   Plaintiff filed a Complaint for property damages to a utility pole installation resulting when an auto-

mobile operated by defendant struck said utility pole installation.

9/22/80 Defendant filed a general denial with jury demand.

10/17/80 Plaintiff filed its first request for admissions, with various exhibits attached thereto.

11/18/80 Defendant filed answers to plaintiff's first request for admissions.

11/19/80 Plaintiff filed a motion for order with respect to defendant's answers and objections to plaintiff's first request for admissions.

3/19/81 Based upon the pleadings, plaintiff's first request for admissions, defendant's answers thereto, plaintiff's motion for order with memorandum attached, and arguments of counsel, the court found that defendant's conduct herein is held to constitute negligence per se.

6/4/81 Plaintiff filed a motion for summary judgment, with a detailed affidavit of plaintiff attached thereto, supporting explicitly the necessity and reasonableness of the total costs which were directly incurred by defendant's conduct. (See the attached Exhibit A, which was the complete itemization of plaintiff's total replacement costs set out with its affidavit). In addition plaintiff filed comprehensive memoranda in support of its motion.

7/7/81 An extensive hearing was held upon plaintiff's motion, which hearing was continued in progress for either party to submit any additional reported or unreported authorities they deemed pertinent. Also plaintiff amended its prayer to $457.79 by withdrawing the $4.00 charge being item #25 on Exhibit A herein.

7/20/81 Plaintiff submitted additional unreported cases for consideration by the court.

9/9/81 Order of summary judgment for plaintiff in the sum of $457.79, plus costs, based upon the pleadings, answers to plaintiff's first request for admissions, plaintiff's sworn affidavit with detailed exhibits, memoranda in support of motions, arguments of counsel, and all reported and unreported authorities cited to the court.

The affidavit of Edmund H. Didlake, filed by plaintiff with its motion for summary judgment, indicated that he is the district data processing manager for plaintiff; that he has personal knowledge of the facts contained in the affidavit; and also that he has years of formal educational training as well as numerous years of practical experience in determining the actual losses incurred by plaintiff in this case.

Mr. Didlake's affidavit further stated in pertinent part the following:

"1) On or about October 30, 1979, at or about 8925 Pippin Road, Hamilton County, Ohio, plaintiff was the owner of various down guys, attachments and ancillary equipment associated with utility pole installation #H-78858RE.

"2) The various costs as utilized by Plaintiff in arriving at their damages herein have been previously reviewed and approved by: the Federal Communications Commission (FCC); the Public Utilities Commission of Ohio (PUCO); the Internal Revenue Service (IRS); Coopers & Lybrand, an independent 'Big Eight' certified Public Accounting Firm; and the Internal Audit Staff of Cincinnati Bell, Inc. No significant errors or deviations from sound accounting practices and procedures were noted, by any of these reviewing and approving entities regarding any and all costs determined herein.

"3) Plaintiff has complied with all State statutes and Rules and Regulations of both the FCC and PUCO in arriving at the damages set out within the Complaint herein.

"4) A detailed analysis of the actual, total costs incurred by Plaintiff, solely as a direct and proximate result of the wrongful misconduct of Defendant herein, is set out upon the attached Exhibit: A which is hereby incorporated by reference as part and parcel of this particular Affidavit, the same as if rewritten herein.

"A) All said costs are the fair and reasonable actual costs for material, plant motor vehicle, plant labor, plant payroll and supporting labor, engineering labor, engineering payroll and supporting labor, and voucher expense, which were required to restore Plaintiff's damaged facilities to the same or similar condition as they existed immediately prior to the time of Defendant's wrongful misconduct hereof. All said costs do no more than make Plaintiff whole and have no profit contained therein whatsoever.

"B) All said costs are only to perform necessary repairs upon only that equipment owned by Plaintiff, and which was directly and proximately damaged solely by the wrongful misconduct of Defendant herein.

"C) Plaintiff is the owner of all materials and motor vehicles set out within Exhibit: A, and utilized its own technically proficient laborers in performing the various tasks indicated thereon. All said costs are to perform only those necessary repairs necessitated by the wrongful misconduct of Defendant.

"D) There is a very limited market, if any, for the various facilities of Plaintiff, which were damaged by Defendant herein. Rather said facilities are part and parcel of the overall integral communications system utilized by Plaintiff in serving its various customers within this community.

"E) All costs herein represent actual costs incurred solely as the result of the wrongful misconduct of Defendant; are applied in strict accordance with sound accounting principles and procedures; are formulated from years of experience and are continually updated.

"F) Plaintiff has actually mitigated Defendant's overall damages herein, by utilizing its own technically proficient internal employees. Such is the case because an outside independent contractor, proficient in performing the repairs herein, submitted a bid to perform the same repairs as performed by Plaintiff hereof, at a total costs in excess of Plaintiff's damages as set out within the Complaint.

"G) The data contained within Exhibit: A was formulated near the time of the damages herein; with the objective of determining actual lost sustained by Plaintiff, and not for the sole objective of litigation; has been transmitted by persons with knowledge; and as a regular practice of Plaintiff is kept and maintained in its routine course of business.

"H) All tasks and costs shown herein, constituted non-productive re-work on damaged facilities, which were caused by the wrongful misconduct of Defendant, and such non-productive re-work directly and proximately prevented Plaintiff from performing productive, new-construction activities and also various preventive, inspection activities so as to fulfill its primary mission of providing and maintaining effective and efficient tele-communications systems to its customers within this community.

"I) The total, actual costs incurred by Plaintiff as the direct and proximate result of solely Defendant's wrongful misconduct; which are the fair and reasonable repair costs to restore Plaintiff's facilities to the same or similar condition as they existed immediately prior to the damages hereof; and which do no more than make Plaintiff whole, without any profit whatsoever; are $461.79."

After the plaintiff supported its motion for summary judgment with sworn testimony, the affidavit with Exhibit A attached hereto, defendant could not rest on the mere allegations of his general denial but must demonstrate by documents of equal evidentiary quality that there was at least one genuine issue of material fact. Civ. R. 56(E); *Alexander* v. *Buckeye Pipe Line Co.* (1978), 53 Ohio St. 2d 241, 7 O.O. 3d 403, 374 N.E. 2d 146; *Johnson* v. *Bromer* (Hamilton Co. Ct. of Appeals, No. C-790521, Oct. 8, 1980), unreported.

The defendant came forward with no equal evidentiary matter, nor affidavits, nor memoranda whatsoever, to refute or contest the appropriateness of plaintiff's copious and detailed affidavit.

Inasmuch as defendant admitted driving his motor vehicle across the double yellow center line and totally off the left hand side of the roadway in striking plaintiff's utility pole installation, this court found negligence per se based upon *Brandt* v. *Mansfield Rapid Transit, Inc.* (1950), 153 Ohio St. 429, 41 O.O. 428, 92 N.E. 2d 1; *Gelfand* v. *Strohecker, Inc.* (N.D.E.D. Ohio 1956), 4 O.O. 2d 446, 150 F. Supp. 655; and *Chambers* v. *McFerren* (1959), 168 Ohio St. 398, 7 O.O. 2d 247, 155 N.E. 2d 917.

Having dealt previously with the facts concerning the measure of plaintiff's damages, the law regarding the appropriate measure of damages in cases similar to the instant case has been pronounced by various courts both within and outside the state of Ohio.

The chronological development of the law within Ohio on the proper measure of damages in similar cases is as follows.

In an action by a telephone company to recover for damage to one of its poles, indirect overhead costs of repairs are a proper element of damage for which recovery may be had, where such costs can be proved with reasonable certainty and have been correctly made in accordance with sound ac-

counting principles. *Warren Telephone Co.* v. *Hakala* (1957), 105 Ohio App. 459, 6 O.O. 2d 201, 152 N.E. 2d 718 (Trumbull County Court of Appeals).

After allowing all transportation expense and applying depreciation to only the capital asset involved, *i.e.,* the pole itself, the trial court did not allow the utility company to recover its stores expense, labor fringe benefits, and administrative and engineering costs, which in the aggregate represented $76.80 of the plaintiff's total replacement costs of $269.03. *Ohio Power Co.* v. *Huff* (1967), 12 Ohio Misc. 214, 41 O.O. 2d 296, 231 N.E. 2d 897 (Stark Co., Canton Mun. Ct.).

In the instant case the pole itself was owned by another utility company, viz. The Cincinnati Gas & Electric Co., and had plaintiff's telephone facilities affixed thereto, thus being a jointly-used pole, which procedure is recognized within R. C. 4905.51. As such, depreciation of the pole itself is not pertinent to this plaintiff.

The *Huff* case was rejected and not followed in Ohio within eighteen (18) months of its original pronouncement.

In a negligence action by an electric utility for damages resulting when defendant's car struck their pole, the damages recoverable are limited to those injuries which flow from and are a natural and probable result of the tortious act complained of, and where such damaged property has no market value, due to lack of market, the measure of damages is the reasonable cost of repairs, limited only to the extent that such amount does no more than make the plaintiff whole. *Ohio Power Co.* v. *Johnston* (1968), 18 Ohio Misc. 55, 47 O.O. 2d 93, 247 N.E. 2d 338 (Hancock Co., C.P. Ct.).

In computing damages, where damages are determined by the cost of repair, indirect expenses, such as overhead costs, engineering and supervision expenses, stores expense, and fringe benefits, where reasonably proven are a proper element of damage to be reflected in the total cost of repairs. *Id.*

The court must begin with the logical deduction that merely because the plaintiff utilized materials and services within its own corporate structure, it does not follow that such services and materials are without value, or have a lesser value than if supplied by an independent contractor. Assuredly it is not this court's intention, nor the intention of the law in Ohio to eliminate overhead expenses and profit from repairmen

engaged in repairing damage occasioned by the wrongful conduct of a third person. *Id.,* at pages 60 and 61.

An Ohio Appellate Court evaluated this same question and within twenty-eight (28) months after the announcement of the decision in *Ohio Power Co.* v. *Huff, supra,* the *Huff* rationale was again rejected and not followed for a second time.

Similarly, variable expenses such as cost of pole storage and administration and engineering expenses can be established by sound accounting principles. All variables can be attacked on the basis of uncertainty; however, for business and legal reasons, we need to establish uniform definite standards for variable expenses on the basis of sound accounting principles. We feel that there is no difference in the application of sound accounting principles to determine the accrued depreciation of a damaged utility pole with a variable life expectancy than to determine the indirect costs of repairing the damaged pole by the application of sound accounting principles to the variable costs of such expenses. *Ohio Power Co.* v. *Zemelka* (1969), 19 Ohio App. 2d 213, 48 O.O. 2d 353, 251 N.E. 2d 2 (Belmont Co., Ct. of Appeals).

As such the *Zemelka* decision fully compensated the public utility company for its total costs of repairs, minus only an allowance for depreciation upon the capital asset itself, viz. the pole, in the sum of $16.40. Again, as stated previously, the pole in the instant case was owned by Cincinnati Gas & Electric Co., with plaintiff's various facilities affixed thereto, and as such depreciation of the pole itself, though potentially pertinent to the claims of the owner thereof, is not germane to the claims of this plaintiff.

As indicated above *Ohio Power Co.* v. *Huff, supra,* is the only reported case within Ohio not allowing a public utility company recovery for the total costs incurred by such public utility when its facilities are damaged when struck by a motor vehicle. The better reasoned cases of *Warren Telephone Co.* v. *Hakala, supra; Ohio Power Co.* v. *Johnston, supra;* and *Ohio Power Co.* v. *Zemelka, supra,* are all supported and followed within the following case law decisional authorities outside of Ohio. *The Philadelphia, United States* v. *Delaware Bay and River Pilots Association* (E.D. Pa. 1935), 10 F. Supp. 43; *Ford Motor Co.* v. *Bradley Transportation Co.* (C. A. 6, 1949), 174 F. 2d 192; *Wisconsin Telephone Co.* v. *Reynolds* (1958), 2 Wis.

2d 649, 87 N.W. 2d 285; *Southwestern Electric Power Co.* v. *Canal Ins. Co.* (1960), 121 So. 2d 769; *Baltimore & Ohio R. Co.* v. *Commercial Transport, Inc.* (C. A. 7, 1960), 273 F. 2d 447; *Conditioned Air Corp.* v. *Rock Island Motor Transit Co.* (1962), 253 Iowa 961, 114 N.W. 2d 304, 3 A.L.R. 3d 679, cert. denied, 371 U. S. 825, 83 S. Ct. 46, 9 L. Ed. 2d 64; *New York State Electric & Gas Corp.* v. *Fischer* (1964), 250 N.Y.S. 2d 567; aff'd (1965), 261 N.Y.S. 2d 310; *N.J. Power & Light Co.* v. *Mabee* (1964), 41 N.J. 439, 197 A. 2d 194; *Carolina Power & Light Company* v. *Paul* (1964), 261 N.C. 710, 136 S.E. 2d 103; *New York State Electric & Gas Corp.* v. *Goettsche* (1965), 48 Misc. 2d 786, 265 N.Y.S. 2d 809, aff'd, 26 A.D. 2d 968, 275 N.Y.S. 2d 1023; *Hartford Electric Light Company* v. *Beard* (1965), 3 Conn. Cir. 323, 213 A. 2d 536; *Geddes & Smith, Inc.* v. *Saint Paul Mercury Indem. Co.* (1965), 63 Cal. 2d 602, 47 Cal. Rptr. 564, 407 P. 2d 868; *Bultema Dock & Dredge Co.* v. *Steamship David P. Thompson* (W.D. S.D. Mich. 1966), 252 F. Supp. 881; *Chicago, Burlington & Quincy Railroad Co.* v. *Ommen* (1970), 130 Ill. App. 2d 713, 264 N.E. 2d 535; *United States* v. *Reserve Mining Co.* (D. 5th Div. Minn. 1976), 423 F. Supp. 759; *Curt's Trucking Co.* v. *City of Anchorage* (1978), 578 P. 2d 975.

The only decisional authority outside of Ohio which supports *Ohio Power Co.* v. *Huff, supra,* is *Central Illinois Light Company* v. *Stenzel* (1963), 44 Ill. App. 2d 388, 195 N.E. 2d 207, wherein the Third District Court of Appeals for Illinois abated the utility company's total bill of $360.34, by only a total of $46.80; but 100% of fringe benefits were allowed in *Stenzel.* However, within seven (7) years of the *Stenzel* decision, the Fourth District Court of Appeals for Illinois expressly rejected and did not follow the earlier rationale of *Stenzel,* but rather allowed the utility full recovery of its total costs incurred. See *Chicago, Burlington & Quincy Railroad Co.* v. *Ommen, supra.*

The Ohio trial court in *Huff* based its 1967 pronouncement heavily upon the Illinois case of *Stenzel* and the New York case of *Fischer,* however, at that time the Illinois case of *Ommen* had not yet been reported. Furthermore the *Huff* court misapplied *Stenzel,* which had allowed 100% of all labor costs, inclusive of fringe benefits; and also misapplied *Fischer,* which allowed full recovery of all expenses, except for an allowance

for depreciation upon the capital assets involved. In addition the *Huff* court did not distinguish nor in any way comment upon *Baltimore & Ohio R. Co.* v. *Commercial Transport, Inc., supra; New York State Electric & Gas Corp.* v. *Goettsche, supra;* and numerous other extra-Ohio decisions supporting plaintiff's position, as are set out herein.

Damages are not uncertain because they cannot be calculated exactly. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate. *Eastman Co.* v. *Southern Photo Co.* (1927), 273 U. S. 359, 47 S. Ct. 400, 71 L. Ed. 684. All that is required is that degree of certainty of which the nature of the case will admit. *Burckhardt* v. *Burckhardt* (1885), 42 Ohio St. 474.

R. C. 4905.13 mandates that public utility companies account for their costs in accordance with the Uniform System of Accounts prescribed by the Federal Communications Commission and the Public Utilities Commission of Ohio.

A uniform system of accounts prescribed for public utility companies by an administrative agency may be awkward or imperfect and yet not so arbitrary and outrageous as to justify a court in restraining its enforcement. *American Teleph. & Teleg. Co.* v. *United States* (1936), 299 U.S. 232, 57 S. Ct. 170, 81 L. Ed. 142.

The proper test in awarding damages is not whether plaintiff currently paid money out of pocket, nor whether plaintiff receives compensation from another source. The fact remains that a tortfeasor is not entitled to diminish payments made by plaintiff, directly, or resulting in an extinguishment or use of equitably, allocated absorption expense factors, based upon actual expenditures, formulated from years of experience, and which are continually updated.

The collateral source rule is an exception to the general rule of compensatory damages in a tort action, and evidence of compensation from collateral sources is not admissible to diminish the damages for which a tortfeasor must pay for his negligent act. *Pryor* v. *Webber* (1970), 23 Ohio St. 2d 104, 52 O.O. 2d 395, 263 N.E. 2d 235. Similarly, a third party wrongdoer is not entitled to have the damage resulting from his wrong diminished by payments made by an employer to an employee injured by such wrongdoer and charged against the accumulated sick and annual leave credits of the employee,

resulting in the extinguishment of such credit. *Rigney* v. *Cincinnati Street Railway Co.* (1954), 99 Ohio App. 105, 58 O.O. 202, 131 N.E. 2d 413, 52 A.L.R. 2d 1443 (Hamilton Co., Ct. of Appeals).

A memorandum, report, record, or data compilation, in any form, of acts, events or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicates lack of trustworthiness, are not excluded by the hearsay rule even though the declarant is available as a witness. Evid. R. 803(6). The court finds that the evidence provided by Plaintiff in the instant case conforms to the requirements of Evid. R. 803(6).

It is elementary that any fact is competent that makes more or less probable the fact in controversy. *State* v. *Reineke* (1914), 89 Ohio St. 390, 106 N.E. 52.

In a telephone rate case, data of unit costs based on data prepared, systematized, and scientifically treated through years of experience by engineers, and accounts of utility commission in dealing with valuations of utilities of all classes held competent where commission's data was submitted in advance to utilities experts. Also, in a telephone rate case, accountant of years of experience in valuation of telephone and public utility properties was competent to testify concerning annual allowance as reserve for actual depreciation, replacements and general obsolescence. *Ohio Associated Tel. Co.* v. *Geiger* (S.D.E.D. Ohio 1933), 3 F. Supp. 997. This same rationale would be true regarding presentment of evidence as to plaintiff's replacement costs as incurred in the instant case.

This court has reviewed the case of *Dayton Power and Light Co.* v. *Puterbaugh* (Miami Co. Ct. of Appeals, No. 79CA13, Mar. 7, 1980), unreported, and does not accept the rationale therein because *Puterbaugh* is totally dependent upon *Ohio Power Co.* v. *Huff, supra,* and *Central Illinois Light Company* v. *Stenzel, supra.* Both *Huff* and *Stenzel* have been later rejected and not followed within their respective jurisdic-

tions of Ohio and Illinois. Also *Huff* and *Stenzel* represent minute deviations from the overwhelmingly, better reasoned authorities cited herein, both within and outside Ohio, which support plaintiff's position and are consistent with this court's decision.

The end result of *Puterbaugh* allowed recovery for only laborers' wages, plus part of material costs, but excluded all transportation costs, fringe benefits and overheads; however *Puterbaugh* did take advantage of a depreciation credit for the capital asset, *i.e.* pole, which is a product of accounting procedures. That total result is illogical, inconsistent with both *Huff* and *Stenzel,* and contrary to the multitude of decisional authorities cited herein.

This court further finds that the case of *Dayton Power and Light Co.* v. *Hershner* (Greene Co. Ct. of Appeals, No. 1101, Mar. 27, 1981), unreported, is distinguishable from the instant case, based upon plaintiff's detailed affidavit with Exhibit: A hereof; the absence of any affidavits or memoranda filed by defendant; and the various authorities cited herein, esp. *Alexander* v. *Buckeye Pipe Line Co., supra; Johnson* v. *Bromer, supra;* Civ. R. 56(E); and Evid. R. 803(6).

The correct meaning of the words "indirect costs," as used in the cases referenced herein is a *financial term* describing variable costs, which do not always fluctuate uniformly nor are they always contemporaneously paid, in conjunction with the necessary and associated work activities caused directly and proximately by the tortfeasor. Nevertheless such costs are a legally sound portion of recoverable "total costs," directly and proximately attributable to the very rework activities made necessary by the defendant's wrongful conduct, and therefore such costs are allowable in order to make the public utility "whole" as to the "total costs" caused solely by the tortfeasor.

The primary mission of the plaintiff is to engage in productive work efforts via new construction tasks, plus the inspection and preventive maintenance of existing facilities, so as to provide the consuming public with effective and efficient tele-communication systems. The work efforts necessitated by the defendant's wrongful conduct herein required the plaintiff to engage totally in nonproductive re-work activities upon its facilities damaged solely by this defendant's conduct. But for the misconduct of defendant, plaintiff would

have been able to accomplish its primary mission of productive work efforts rather than being compelled to engage exclusively in non-productive re-work efforts directly and proximately attributable to this defendant's conduct. Furthermore, all total costs elements incurred when these facilities were productively installed initially must again be considered and evaluated when plaintiff is compelled to perform non-productive re-work attributable to defendant's conduct. Anything less would violate the cardinal rule of damages, viz., "to make the plaintiff whole."

The uncontroverted evidence herein is that plaintiff actually mitigated the total costs directly attributable to this defendant's wrongful conduct by using its own, internal and technically proficient employees, equipment, and organizational structure.

For the reasons stated herein plaintiff's motion for summary judgment is granted in the sum of $457.79, plus costs.

*Motion granted.*

*EXHIBIT A*
*ITEMIZATION OF PLAINTIFF'S*
*TOTAL REPLACEMENT COSTS*

| | | Amount |
|---|---|---|
| I. | Material Expenses | |
| | 1) 30 feet of 10M strand guy wire @ $0.1497 per foot; | $ 4.49 |
| | 2) 1 - 6M strand Vice (Holds Strand @ end) | |
| | 1 - 10 M strand Vice (Holds Guy @ end) | |
| | 1 - 3 Bolt Clamp (Holds Guy by anchor) | |
| | 3 Man-Hours x $2.827/Man-Hour; | 8.48 |
| | 3) 3 - 5/8 Guy Hooks (End of Strand/Guy) | |
| | 2 - 5/8 12" A bolts (Thru pole to hold strand and cable) | |
| | 4 - Cable Clamp Lashing (End for lashing wire) | |
| | 3 - Support Cables (Plastic or stainless steel band) | |
| | 3 - Spacer Cables (Plastic separators between cable and strand) | |
| | 1 - Fargo Connector Clamp (Connect ground wire) | |
| | 2 feet of Ground wire (To splice ground wire) | |
| | 3 Man-Hours x $4.977/Man-Hour | 14.93 |
| | 4) 189 feet of Lashing Wire (Holds cable to support strand) | |
| | 3 Man-Hours x $1.967/Man-Hour | 5.90 |
| | 5) 1 - Drive Hooks (Holds drop wires) | |
| | 4 - P Clamp (Drop wire clamp) | |
| | 10 feet drop wire (House service wires) | |
| | 2 - Drop splicing eggs (Plastic clamp to join drop wire) | |
| | 3 Man-Hours x $0.00/Man-Hour | 0.00 |
| | TOTAL MATERIAL EXPENSES | $33.80 |

II.   Plant Motor Vehicle Expenses

    1 - Telsta Truck (approx. value of $37,000.00)

    1 - Pick-up truck

    1 - Coupe

      Above Plaintiff's vehicles were used on the following operations and expenses incurred representing the fuel, lubrication, tires, tubes, chains, repairs, tools, licenses, inspection fees, depreciation, insurance and salaries and expenses of personnel who maintain these motor vehicles, to directly support and accomplish the following work activities associated with said motor vehicles:

| | |
|---|---:|
| 6) 3 Man-Hours replacing anchor & guy x $6.7577/Man-Hour | 20.27 |
| 7) 3 Man-Hours rearranging aerial transmission lines x $6.7577/Man-Hour | 20.27 |
| 8) 3 Man-Hours repairing damaged lashing wire and aerial supports x $6.7577/Man-Hours | 20.27 |
| 9) 3 Man-Hours rearranging and repairing drop (house service) wires x $6.7577/Man-Hour | 20.27 |
| TOTAL PLANT MOTOR VEHICLE EXPENSE | $81.08 |

III.   Plant & Engineering Labor Expenses

    3 - Outside Plant Technicians (Meredith Jump, Kim Comer, and, Paul Alexander); plus 1-Plant Supervisor (John Schmidt) performed, supervised and assisted the following work efforts:

| | |
|---|---:|
| (10) 3 Man-Hours removing guy and materials shown in (1) and (2) herein and replacing materials shown in (1) and (2) x $15.591/Man-Hour | 46.77 |
| 11) 3 Man-Hours removing support strand and materials shown in (3) herein and replacing materials shown in (3) x $15.591/Man-Hours | 46.77 |
| 12) 3 Man-Hours removing the 189 feet of lashing wire shown in (4) and replacing materials shown in (4) x $15.591/Man-Hours | 46.77 |
| 13) 3 Man-Hours removing the drop (house service) wires and materials shown in (5) herein and replacing materials shown in (5) x $15.591/Man-Hours | 46.77 |
| Plant Labor | $187.08 |

| | |
|---|---:|
| 14) Employer's Social Security contributions required by law for 3-Outside Plant Technicians and 1-Plant Supervisor | 15.15 |
| 15) Retirement pension, sick pay, life insurance, hospital, medical and dental insurances, death benefits and savings plan, which are dictated by law and/or contract for 3-Outside Plant Technicians and 1-Plant Supervisor | 64.73 |
| 16) Small tool expense, plus equitable allocation of salaries and expenses of the operation staff, which write instructions, prepare budgets, analyzes results and provide training to directly support the plant work activities performed herein | 25.24 |
| 17) Equitable allocation of salaries and expenses of the Executive Dept. in providing policy, benefits, safety and overall management; the Accounting Dept. in providing cost analysis data | |

and reports; the Treasurer's Dept. in disbursing payrolls, insurance and benefit funds; to directly support the plant work activities performed herein — 26.00

|  |  |
|---|---|
| Plant Payroll & Supporting Labor | $131.12 |
| TOTAL PLANT LABOR | $318.20 |

1 - Supervisor Engineering Dept./Thomas Ross, performs and supervises various research, analysis and drafting techniques to update Company records and plats to identify the repaired equipment and provide data utilized for the purposes of accountability, taxes, depreciation and development of unit costs.

18) 1/4 Man-Hours analysis and noting the replacement anchor and guy x $17.07/Man-Hour — 4.27

19) 1/4 Man-Hours analysis and noting the arrangement of aerial transmission lines x $17.07/Man-Hour — 4.27

20) Supplies, and general housekeeping expense for 1 - Supervisor Engineering Dept. 1/2 Man-Hour x $7.25/Man-Hour — 3.62

21) Expenses in preparing budgets, development of unit cost data and indexing, analyzing, and applying data compiled 1/2 Man-Hour x $10.24/Man-Hour — 5.12

|  |  |
|---|---|
| Engineering Labor | $17.28 |

22) Employer's Social Security contribution required by law for 1 - Supervisor, Engineering Dept. — 1.04

23) Retirement pension, sick pay, life insurance, hospital, medical and dental insurance, death benefits and saving plan, which are dictated by law and/or contract for 1 - Supervisor, Engineering Dept. — 4.56

24) Equitable allocation of salaries and expenses of the Executive Dept. in providing policy, benefits, safety and overall management; the Accounting Dept. in providing cost analysis data and reports; the Treasurer's Dept. in disbursing payrolls, insurance and benefits funds; to directly support the engineering work activities performed herein — 1.83

|  |  |
|---|---|
| Engineering Payroll and Supporting Labor | $7.43 |
| TOTAL ENGINEERING LABOR | $24.71 |

25) Voucher expense to procure accident report for use in formulation of requisite billing invoices. — 4.00

|  |  |
|---|---|
| TOTAL PLANT AND ENGINEERING LABOR EXPENSES | $346.91 |

IV. Total Costs of Repairs and Replacements

| | |
|---|---|
| 26) Total Material Expenses | 33.80 |
| 27) Total Plant Motor Vehicle Expense | 81.08 |
| 28) Total Plant and Engineering Labor Expenses | 346.91 |
| GRAND TOTAL OF REPAIRS AND REPLACEMENTS | $461.79 |